Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | George W. Lindberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3846 | **DATE** | 7/12/2001 |
| **CASE TITLE** | Betty Pernell Brown vs. The Options Clearing Corp. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Summary judgment is entered in favor of defendant, The Options Clearing Corporation. Enter memorandum opinion and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUL 13 2001 | |
| | Notified counsel by telephone. | | date docketed | 38 |
| | Docketing to mail notices. | FILED FOR DOCKETING | docketing deputy initials | |
| | Mail AO 450 form. | 01 JUL 12 AM 11: 35 | 7/11/2001 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| SLB | courtroom deputy's initials | Date/time received in central Clerk's Office | SLB mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BETTY PERNELL BROWN,       )
                           )
        Plaintiff,         )     00 C 3846
                           )
    v.                     )
                           )     Judge George W. Lindberg
THE OPTIONS CLEARING CORPORATION, )
                           )
        Defendant.         )

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Betty Pernell Brown, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. She claims that her former employer, The Options Clearing Corp. (OCC), discriminated against her on the basis of race when it denied her promotions and training, paid her less than Caucasian employees, and refused to grant her a schedule change. OCC has moved for summary judgment.

I.  Background

A.  Promotions

OCC clears stock option transactions and acts as a guarantor of those transactions. The company's data center includes a director of data services and computer services who manages the data services department and the disaster recovery department. In May 2000, OCC had three production managers (one for each shift) who reported to the data center manager. Each shift also had a floor leader who reported to the production manager. Finally, the technical operations specialists (TOS) reported to the floor leader.

Brown began working at OCC in April 1991 as a production control clerk. She became a technical operations specialist (TOS) in either 1995 or 1996. A TOS monitors computer systems and software applications across multiple platforms, and reports and documents processing anomalies. Brown apparently began on the second shift; she later requested and received a transfer to the first shift. When Brown started at OCC, her supervisor was Frank Bartl, production control manager, and she also reported to Eric Turner, second shift manager who was later promoted to data center manager.

In 1995, plaintiff expressed to Turner an interest in an open disaster recovery coordinator (DRC) position. Brown had previously worked as an assistant to the DRC for approximately six months, after which time she returned to the TOS position. Turner told Brown that she would have to formally apply for the position through the human resources department. Brown believes that she did notify human resources of her interest although OCC claims she did not do so. Turner hired Joy Siergiej, a Caucasian woman, for the position.

In 1997, Brown applied for a technical support specialist position. The technical support department maintains and controls all production systems, and is responsible for the support of all production applications on all platforms, including diagnosing and resolving problems. Gene Krokosz, a director at OCC and head of the technical support specialists, interviewed Brown but ultimately hired Karen Girkant, a Caucasian woman, for the position. Krokosz stated that Girkant had more experience in and knowledge of a computer system/program that the position required than plaintiff did.

In early 2000, OCC created a new position of floor leader. This person would be a first line supervisor assisting and filling in for the production manager. The floor leader would be

responsible for TOS employees on the shift; for coordinating shift duties, coverage and turnover; and for covering additional shifts, including weekends. The position required technical knowledge to understand the TOS job, and interpersonal skills to supervise and administer the employees on the shift. OCC claims that before the official creation of the position, Beulah Smith, an African-American woman, performed the floor leader duties.

Siergiej was responsible for filling the floor leader position. She testified that she informed everyone on the shift about the opening, distributed a written job description, and that only Brown and Fran Krischunas, a Caucasian woman, expressed interest in applying for the position. Krischunas had transferred from the second shift to the first shift in January 2000. Siergiej considered Brown and Krischunas for the position, and ultimately chose Krischunas. According to Siergiej, Krischunas had similar technical skills to Brown, but had a more pleasant and less confrontational attitude toward her co-workers. Siergiej also felt that Krischunas displayed initiative on the job. For example, she took an interest in updating the company's home page on its internal Internet system.

Siergiej stated that although Brown understood the TOS tasks, she lacked essential interpersonal skills that the floor leader position required. Siergiej stated that she thought Brown's ability to communicate with her co-workers was weak and that she was unwilling to listen to others. Siergiej had noted her observations of Brown's problems in this area in her Brown's November 1999 evaluation, where Siergiej stated that "Betty has been a consistent performer in all competencies with the exception of communication. She needs to work on her listening skills . . . She has a tendency to interrupt others, and not allow them to finish their thought or question."

Brown points out the positive comments her reviews contained throughout the years concerning her performance, as well as her overall ratings as high as "highly competent." Her 1994 evaluation stated that she "works well with other both inside and outside the department" and "has been giving assistance to our new employee and in training the operators." Brown's 1995 evaluation, stated that she "develops good working relationships with her coworkers."

Her evaluations, however, also contained comments about Brown's interpersonal problems with both coworkers and customers, and the tension it caused within the department. Her 1995-1996 evaluation stated that plaintiff "needs to improve her communication skill with our clearing ops users and be more responsive to their needs," and "needs to improve her professionalism in the area of customer services." Her 1997-1998 evaluation stated that plaintiff "has a problem with giving input to a conversation without being solicited for the input. This has caused conflict both with her coworkers and management." Also, plaintiff "needs to get over her confrontational tactics and become a team member with her coworkers and management."

Siergiej stated that two other shift employees, Monique Collins, an African-American woman, and Don Chin, an Asian man, volunteered their opinions to her that they preferred Krischunas over Brown for the floor leader position. When Siergiej told Eric Turner, then the data center manager, that she thought Krischunas would be the be best choice for the position; he agreed. Krischunas began her role as floor leader in April 2000.

In the Spring of 2000, Brown sent an e-mail to Sue White in the human resources department indicating that she was interested in an open configuration management technical specialist position. White responded that Brown needed to apply by using the on-line application form. Brown never filled out an application form for the position. She claims it is because she

was advised that someone else had already been selected for the position, although she does not indicate who told her this or how she heard it.

B.      Training

OCC provides various training opportunities to its employees. All employees are eligible to participate in OCC's tuition reimbursement program, under which the company reimburses employees for undergraduate or graduate level courses in computer science and business. The company also offers in-house industry classes that cover the basics of options trading, and brown-bag lunches that cover technical and business developments. Also available is training in topics such as business writing and communication skills, and technical training. Some of theses courses are available on a self-enroll basis, while others require management recommendation.

Management makes decisions regarding who receives training based on the department's needs; external training is offered if necessary to perform assigned work. OCC maintains that its training is not designed to prepare employees for another job or promotion within the company but is offered to allow an employee to better perform his or her current position.

Plaintiff requested a PC hardware class, but was told it was not related to her work with the mainframe computer. She received in-house training (taught by an external teacher) on Netscape, and attended an Internet programming course in-house. OCC also paid for Brown to take an external PC troubleshooting course during company time. Brown took Unix training and on-line interactive training at OCC. She alleges, however, that she received no training that would prepare her for advancement within the company and that similarly situated Caucasian employees received training to perform the positions to which they were promoted over plaintiff.

OCC alleges that a new vice president who assumed responsibility of the data center in early 2000 placed a strong emphasis on training. In May 2000, plaintiff and another TOS employee were scheduled to attend a four-day Unix seminar. Herman Weaver, OCC's Unix administrator, canceled the class because he wanted a Unix class more appropriate to OCC's technical environment. In June and July 2000, six TOS employees, including four African-American employees, attended a five-day training course on Internet and network communications and fundamentals. The course cost $2,590 per employee, and employees attended the course during company time. Brown was on medical leave from May 25, 2000, until August 1, 2000, and therefore did not attend this training.

C. Shift Assignments

OCC's first shift covers all seven days of the week. There are three or four TOS employees working the shift, so one or two work Monday through Friday, one works Tuesday through Saturday, and one works Sunday through Thursday. From 1991 to 1996, Brown worked the Tuesday through Saturday schedule. After working as the assistant to the DRC in 1996 (where she worked Monday through Friday), Brown switched to the Sunday through Thursday schedule. OCC claims that this schedule change was a response to Brown's request to have Saturdays off.

Krischunas worked a weekend schedule (Tuesday to Saturday) until she became floor leader, when she switched to a Monday to Friday schedule. Brown claims that in late 1999, she asked Turner and Siergiej to give her a Monday to Friday schedule. Both supervisors told Brown that she could have weekends off when a new employee was hired. Turner stated that he worked with his production managers to see if they could move other employees to the weekend shift so

that Brown could work Monday through Friday. One of the employees who would have been affected, according to Turner, went on medical leave and made the shift change unworkable. Turner also asserted that two of the four TOS employees who worked Monday through Friday were African-American.

D.   Salaries

When OCC hired Brown in April 1991, her starting salary as a senior production scheduler was $24,000 a year. When she retired in August 2000, her salary was $36,991 a year. OCC states that in January 2000, TOS salaries ranged between $28,000 and $50,889. The market data indicated that for equivalent TOS positions that required six or more years of experience, salaries ranged between $32,000 and $53,000. In 1998 and 1999, Brown received salary adjustments, in addition to annual salary increases, of 10.15% and 5.22% to maintain her salary at market level.

Siergiej's starting salary as an application architect in 1996 was $42,000. Her annual salary as disaster recovery coordinator in February 2001 was $78,000. Fran Krischunas' starting salary as a TOS in June 1999 was $40,000. When she was promoted to floor leader in April 2000, her annual salary increased to $47,000. Monique Collins, an African-American, was making the same amount as Krischunas in January 2000. Rochie Surles, an African-American, started as a TOS in May 1999 at an annual salary of $41,600. Richard Thomas, an African-American, started as a TOS in September 1998 at an annual salary of $40,000.

On April 25, 2000, Brown filed a formal charge of discrimination with the EEOC, which issued a notice of right to sue on May 15, 2000. She filed the instant lawsuit on June 23, 2000. OCC has filed a motion for summary judgment. Brown took a medical leave from May 25,

2000, until August 1, 2000, when she returned to work. She informed OCC in early August 2000 that she would be retiring on August 31, 2000.

II.   Discussion

A.   Promotions

To establish a prima facie case under Title VII for failure to promote, plaintiff must establish: 1) she is a member of a protected class; 2) she applied for and was qualified for the position; 3) she was rejected for the position; and 4) the person who was promoted had similar or lesser qualifications, or other evidence exists from which one can infer that the plaintiff was denied the promotion for a discriminatory reason. *Pafford v. Herman*, 148 F.3d 658, 669(7th Cir. 1998).

OCC first claims that under Brown's claim of failure to promote, two of the four positions about which she complains are time-barred. The disaster recovery coordinator position was open in 1996, and the technical support specialist position was open in 1997. A plaintiff must file an EEOC charge within 300 days of the action about which she complains, and Brown did not file her EEOC charge until April 2000.

Brown claims that the statute of limitations does not bar any of her claims because the continuing violation doctrine allows her to recover for acts beyond the limitations period if she can demonstrate that such acts are linked to an act within the limitations period. *Freeman v. Madison Metro. Schl. Dist.*, 231 F.3d 374, 381 (7th Cir. 2000). Brown claims that, like the plaintiff in *Freeman*, it was "only with the benefit of hindsight, after a series of discriminatory acts, could [plaintiff] have realized [she] was the victim of unlawful discrimination."

In *Freeman*, however, the Seventh Circuit noted that the statute of limitations for a promotion decision begins to run when the plaintiff "knows the allegedly discriminatory decision has been made." *Id.* at 381. This case is more similar to *Jones v. Merchant Nat'l. Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994), where the court held that the date the plaintiff knows a decision about the promotion has been made is the date the statute of limitations begins to run. *Id.* "(E)ach promotion was a discrete decision and each time Jones knew, or should have known, that she had not received the promotion and another person had." *Id.* (citation omitted). Here, Brown knew in 1996 and in 1997 that she did not receive the promotion requested and someone else had. The April 2000 EEOC charge was therefore untimely as to these two promotions, and the court grants summary judgment as to these two actions on that basis.

As to the configuration management technical specialist position, OCC claims that Brown cannot establish a prima facie case because she admits that she never submitted the required on-line application for the position. As plaintiff does not address the configuration management position in her response, and because she did admit in her deposition that she did not complete the on-line application for the position, the court grants summary judgment to OCC as to this claim as well.

OCC concedes that Brown has established a prima facie case as to the floor leader position for which she applied in early 2000. It maintains, however, that Brown cannot establish that its reasons for choosing Krischunas instead of her for the position were pretextual. It claims that the floor leader's responsibilities included effective communication and cooperation with the TOS staff, and that Brown had not demonstrated these skills during her tenure with OCC. Siergiej, the decision-maker, thought that Brown was lacking in interpersonal skills as to her

coworkers. Two TOS employees on Brown's shift confirmed Siergiej's impression when they volunteered that they preferred Krischunas for the floor leader position. OCC asserts that Brown has simply not established that Siergiej's purported basis for the decision is in any way pretextual.

The parties both detail Brown's evaluations to support their respective positions. Brown counters that OCC's criticism of her interpersonal skills is not based in fact, pointing to her overall ratings of "highly competent" on particular evaluations and with quotes from her evaluations of positive comments about her skills. Brown claims that negative comments in her November 1999 evaluation, which Siergiej completed, were a "marked departure" from her previous evaluations. She blames Siergiej's criticisms on an altercation Brown had with another employee, Al Brown (African-American), despite his admission that he was fully at fault for the incident. Brown also denies that she and Krischunas were equally technically qualified, claiming that Krischunas had only started working at the company in June 1999, and that Brown provided Krischunas with assistance on the job when she started. Brown also disagrees with Siergiej's description of how many times she met with Brown and Krischunas to discuss the position, and states that contrary to Siergiej's statements, Siergiej did not formally interview Brown or Krischunas for the position.

None of Brown's points establish that Siergiej's reason for not choosing Brown for the floor leader position are pretextual. First, Brown does not explain how her interpretation of the criticisms in the 1999 evaluation establishes that Siergiej's reason for preferring Krischunas was a pretext for race discrimination. Also, OCC submitted complete copies of Brown's evaluations. Although Brown is correct that her overall ratings were no lower than "meets expectations" and

as high as "highly competent," as OCC points out, the evaluations do repeatedly contain comments concerning Brown's confrontation style and problems communicating with coworkers, customers and management. These criticisms also predate the confrontation Brown had with Al Brown.

As to Brown's claims that Krischunas was not as technically qualified as she was because she had only started at the company in 1999, Krischunas did have experience in the field before she joined OCC. Assistance to a new employee–even an experienced one–is expected in any new position, and does not establish that the employee is unqualified. Krischunas' 1999 start date with OCC does not establish that Siergiej's belief that Krischunas was as qualified as Brown was unreasonable or not based in fact. Although Brown claims that a jury question exists as to whether she was more qualified than Krischunas, that misstates the relevant question in a Title VII case. The court does not sit as a "super-personnel" department; it is not here to determine if OCC made the correct decision when it chose Krischunas over Brown. *See, eg., Guerrero v. Ashcroft*, – F.3d –, 2001 WL 651188 (7th Cir. 2001). The only proper inquiry is whether plaintiff has established that Siergiej's proffered reason for preferring Krischunas over her was a pretext for race discrimination. The question is simply whether Siergiej believed that Krischunas was more qualified than Brown to act as floor leader, not whether that conclusion is actually true. OCC does not deny that in general, Brown performed her position well and was a competent employee. Its criticisms of Brown's communication skills, however, are documented in her evaluations and support Siergiej's proffered legitimate, nondiscriminatory basis for the employment decision. Three other managers, all of whom were African-American, concurred with Siergiej's decision to choose Krischunas.

Brown has therefore not established that Siergiej's reason was false and merely a pretext for race discrimination. On that basis, the court grants OCC's motion for summary judgment as to plaintiff's claim that the company's failure to promote her to the floor leader position was based on race, in violation of Title VII.

B.  Training

The Seventh Circuit has stated that "failure to receive training might be an adverse action." *Cullom v. Brown*, 209 F.3d 1035, 1041 (7th Cir. 2000) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)). A prima facie case of discriminatory failure to train requires plaintiff to establish: "1) that she is a member of a protected group; 2) that [OCC] provided training to its employees; 3) that she was eligible for training; and 4) that she was not provided training under circumstances giving rise to an inference of discrimination, i.e., that she was denied training given to other similarly situated employees who were not members of the protected group." *Pafford*, 148 F.3d at 667. "[Plaintiff] must come forward with specific evidence showing that she was similarly situated to Caucasian employees who received more training." *Id.*

The individuals to whom plaintiff compares herself–Joy Siergiej, Fran Krischunas, Karen Girkant and Jeremy Diemer–received, in plaintiff's own words, "extensive training that assisted them in learning jobs they were newly promoted to." These employees, however, did not receive training while a TOS and are therefore not similarly situated to Brown. *Pafford*, 148 F.3d at 668 ("the mere fact that Caucasian employees may have received more training than Pafford falls short of raising an inference of discrimination. Pafford must come forward with specific evidence showing that she was similarly situated to Caucasian employees who received more

training"). Plaintiff complains that "she was denied the very training that would have given her [the] skills" to obtain a promotion. OCC states that it does not provide training to employees so that they may earn promotions; instead it offers training that assists them in their current positions. The employees plaintiff compares herself to received training for their current positions, after they had been promoted. There is no evidence that these employees received training so that they might be promoted. Instead, they were promoted to positions for which OCC considered them qualified, and received training appropriate for those positions.

As to the Unix training class plaintiff signed up for and which was cancelled, plaintiff has done nothing to establish any inference that this was done for a reason other than the fact that the class was not appropriate for OCC's needs. Other training courses were later offered, and the other African-American employee who planned to attend the cancelled Unix class attended that course. Considering the variety of training opportunities that OCC offered, the cancellation of one class does not give rise to an inference that the company was discriminating against Brown because of her race.

C.  Salaries

Brown's only mention of a pay differential claim in her response is a statement that Siergiej, Krischunas and Girkant had higher salaries than she did, and Diemer, whom Brown describes as a 20-year-old with no experience, made $25,000 when he was hired in 1999, and $35,000 a year later. Brown offers no comparison of the educational or work backgrounds of Siergiej, Krischunas and Girkant to her own to support a claim that their higher salaries were unjustified. OCC asserts that Siergiej, Girkant and Diemer were not TOS employees, and are therefore not similarly situated to Brown. In addition, it claims that Krischunas was hired at a

-13-

salary of $40,000 in June 1999 based on her salary at her previous job and her salary demand to OCC.

The company also argues that Brown has selected Caucasian employees who made more money than she did from the pool of TOS employees, but has excluded African-American TOS employees who made more money than she did. OSS maintains that if one expands the group to include these employees, Brown cannot establish a prima facie case. Monique Collins, an African-American, was making the same amount as Krischunas as a TOS. Rochie Surles, an African-American, started as a TOS in May 1999 at an annual salary of $41,600. Richard Thomas, an African-American, started as a TOS in September 1998 at an annual salary of $40,000.

Again, plaintiff cannot establish a prima facie case of discrimination by comparing herself to employees in different positions, or by providing the court with an incomplete statistical analysis of comparable employees. The evidence Brown submitted is simply insufficient to establish that her salary--or the salary of African-American employees in general--was lower than similarly situated Caucasian employees.

D.  Shift Assignments

OCC claims that Brown cannot establish an actionable claim concerning her Sunday schedule because it is not an adverse action and because plaintiff cannot establish that employees outside her protected class were treated more favorably. The first shift worked seven days a week, with one or two employees working Monday to Friday, one employee working Sunday through Thursday, and one employee working Tuesday through Saturday. OCC acknowledges that plaintiff requested to be removed from Sundays, but asserts that it was unable to do so before

she retired. It maintains that of the four TOS employees who worked the Monday to Friday schedule on all the shifts, two were African-American.

Brown has not explained how the Sunday to Thursday shift materially affected her employment. *Mingo v. Roadway Express, Inc.*, 135 F.Supp.2d 884, 901 (N.D.Ill. 2001). "This schedule switch would not have resulted in an increase in [plaintiff's] salary, title, rank, or benefits, nor would it have affected her responsibilities or the hours [she] was expected to work." *Id.* It is therefore not an adverse action, and plaintiff cannot establish a prima facie case as to this claim.

III. Conclusion

Because plaintiff has failed to establish that OCC's proffered reason for hiring Krishchunas for the floor leader position is pretextual, and has failed to establish a prima facie case that OCC denied her training, salary benefits or scheduling comparable to similarly situated employees, the court grants OCC's motion for summary judgment in its entirety.

**ORDERED:** The court grants defendant OCC's motion for summary judgment.

**ENTER:**

*[signature]*

George W. Lindberg
United States District Judge

DATED: July 12, 2001

-15-